# EXHIBIT "B"

Docusign Envelope ID: 217DCCFE-DC72-474D-9F8F-16F0E1FFD3B5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SUSAN FRENCH, as PARENT and NATURAL GUARDIAN of Z.F., a minor, <br><br> Plaintiff, <br><br> vs. <br><br> ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, MOJANG AB, AND JOHN DOES 1-50. <br><br> Defendants. | Case No.  2:25-cv-05306-MRP <br><br> Hon. Mia Roberts Perez |

**DECLARATION OF KENNETH J. MOYLE, JR.**

**I. Background**

I, Kenneth J. Moyle, Jr., declare as follows:

1. I am over the age of eighteen and competent to make this declaration. I make this declaration based on my personal knowledge, professional experience, and review of materials described below. If called as a witness, I could and would testify competently to the matters stated herein.

2. I am the Managing Director of K6 Partners LLC ("K6 Partners"), a consulting firm based in Bellevue, Washington. K6 Partners provides advisory services to businesses undergoing digital transformation, including the conversion of paper-based processes into electronic and online workflows.

3. Throughout my career, I have focused on the design, evaluation, and operation of electronic acceptance, electronic signature, and digital transaction systems. My work has involved

assessing how acceptance events are generated, recorded, and attributed, and how businesses manage operational risk associated with electronic consent.

## II. Qualifications

4. My qualifications for forming the opinions expressed in this declaration are based on my professional experience in the electronic signature software industry, my work in private- and public-sector policy matters relating to electronic transactions and digital identity, and my consulting practice advising companies on electronic acceptance systems. I have no personal interest in this litigation or its outcome.

5. I am a lawyer by training and have practiced as in-house counsel at software companies since 1999, including Onyx Software (NASDAQ: ONXS), Askme Corp., Insightful Corp. (NASDAQ: IFUL), DocuSign, Inc. (NASDAQ: DOCU) ("DocuSign"), and Dragonchain, Inc. In those roles, I advised on issues related to electronic transactions, online agreements, and digital consent processes.

6. For nine years, I served as General Counsel and Chief Legal Officer of DocuSign. In that role, I advised on product and policy decisions affecting the operation and integrity of electronic signature workflows. I authored articles, blog posts, and book chapters addressing electronic signature practices and regularly lectured on these topics at industry conferences and consortia.

7. From 2007 to 2016, I served as a board member of the Electronic Signature & Records Association (ESRA), a Washington, D.C.–based trade organization focused on adoption of digital transactions. I served as Chairman in 2012 and established ESRA's public policy committee to address legislative and regulatory issues affecting electronic signatures and records. I later continued managing that committee as a consultant through 2019.

2

8. At K6 Partners, I was routinely retained to advise on or evaluate electronic signature and electronic acceptance processes, including auditing lending and transactional systems under the published <u>Standards and Procedures for Electronic Records and Signatures</u> (SPeRS). I have also been engaged to independently assess electronic signature software and to educate legal and compliance professionals on electronic transaction practices.

## III. Nature, Scope, and Methodology of My Opinions

9. Although I am a lawyer by training, I do not offer legal opinions in this declaration. I do not opine on contract formation, enforceability, arbitration, or compliance with any statute, regulation, or judicial decision.

10. My opinions are based on my experience evaluating electronic acceptance systems from an operational and industry-practice perspective. In forming my opinions here, I applied the same methodology I use in non-litigation consulting engagements, including:

• reviewing described user-facing workflows;

• identifying what information the system records at acceptance;

• assessing whether those records reasonably identify the individual performing the action; and

• comparing those practices to commonly used approaches in comparable industries.

11. This methodology has been applied repeatedly over many years across numerous platforms and industries and is commonly relied upon by businesses to evaluate electronic consent risk outside of litigation.

## IV. Materials Reviewed and Scope of Assignment

12. I have reviewed Exhibits 1-17 of Defendant's Motion to Compel Arbitration and Stay, and the declaration of David Saunders, describing Epic Games, Inc.'s account creation

3

processes, date-of-birth collection, cabined account framework, parental consent workflows, Terms of Service changes, EULA presentation, and EULA acceptance records (the "Saunders Declaration").[1] I have not reviewed Epic Games's internal source code, backend logs, or proprietary system documentation.

## V. Industry Baseline for Attributing Electronic Acceptance

13. Based on my experience, there are widely accepted baseline practices for attributing an electronic acceptance event—sometimes referred to operationally as an electronic signature—to a specific individual.

14. At a minimum, systems intended to support reliable attribution ordinarily maintain records showing the date and time of acceptance, the version of terms presented, the method of acceptance, and technical context sufficient to connect the event to an identifiable user.[2] Importantly, the presence of detailed system logs, timestamps, or acceptance records does not, by itself, satisfy this industry baseline. Such records establish that an acceptance event occurred, but they do not resolve the separate and critical question of who performed the acceptance action unless the system includes controls that link the event to an authenticated, identifiable individual.

15. These practices were developed following the promulgation of the Uniform Electronic Transactions Act ("UETA") and the subsequent enactment of the federal Electronic Signatures in Global and National Commerce Act ("ESIGN"), emphasizing attribution and record integrity as foundational concepts. I reference those statutes only as background for industry practice, not to offer legal conclusions.

---

[1] Declaration of David Saunders in Support of Epic Games, Inc.'s Motion to Compel Arbitration and to Stay or, in the Alternative, to Transfer Venue, January 8, 2026.

[2] *See* e.g. SPeRS Standard 4-5. ATTRIBUTING A SIGNATURE, Elec. Fin. Servs. Council, Standards and Procedures for electronic Records and Signatures (SPeRS) (ver. 3.0, 2016).

## VI. Limitations of the Acceptance Records Produced

16. The Saunders Declaration includes excerpts from system records and exhibits reflecting timestamps and account-level logs associated with End User License Agreement acceptance events.[3] These materials show that acceptance actions were recorded at particular dates and times.

17. However, the records described and produced do not identify the individual who performed the acceptance action. The logs attribute acceptance to an account, session, or system event, but do not indicate who was physically present, who was logged in, or whether the acceptance action was performed by the account holder, a family member, or another user with access to the account or device.

18. From an electronic contracting perspective, this distinction is critical. While timestamps and system logs can establish that an interaction occurred, they do not, without additional attribution controls, establish who performed the interaction. In my experience, industry-standard acceptance systems that are intended to support reliable attribution typically include additional information linking the acceptance event to an authenticated individual, not merely to an account or session. Accordingly, although the Saunders Declaration provides detailed event records, those records do not resolve the central attribution question: whether acceptance of the EULA can be reliably tied to a specific, identifiable person.

## VII. Account-Level Activity and Identity Ambiguity

19. Throughout the Saunders Declaration, actions are consistently attributed to "the Account," rather than to a specific user, parent, or adult.[4]

---

[3] Declaration of David Saunders, *supra*, ¶¶ 50-79
[4] Id. ¶¶ 47-79

20. From a systems-design standpoint, this language reflects that Epic Games's records track activity at the account level, not at the level of an identified individual.

21. In my experience, where systems reliably identify who performed an action, records typically refer to the authenticated user or individual. The repeated reliance on account-level descriptions indicates that Epic Games does not know who was operating the account at the time of acceptance.

## VIII. Verification Processes and Missing Documentation

22. The Saunders Declaration describes front-end disclosures, date-of-birth collection, cabined accounts, and parental consent flows, but it does not describe the internal verification processes used to attribute EULA acceptance to a specific individual.[5]

23. The declaration does not explain how Epic Games verifies who is logged into an account at the moment of acceptance, distinguishes between minors and adults, or prevents or detects account sharing in connection with acceptance events.

24. From an industry perspective, these details are essential to evaluating the reliability of an electronic acceptance process. Their absence would typically warrant further technical review or system audit.

## IX. Qualifications of Epic Games's Declarant

25. The Saunders Declaration is submitted by David Saunders, identified as a Product Management Director who has worked at Epic Games since 2023.[6]

26. The declaration describes the declarant's familiarity with Epic Games's products and user-facing workflows, but it does not indicate that the declarant has specialized expertise in

---

[5] Id. ¶¶ 6-31 & Ex. 1
[6] Id. ¶ 1

electronic signature systems, identity attribution, authentication controls, or acceptance audit logging.

27. In my experience, evaluating whether an electronic acceptance process reliably attributes assent to a specific individual requires technical and operational expertise in system architecture, identity controls, and acceptance-event logging. That expertise is distinct from general product management responsibilities, which typically focus on feature design, user experience, and product requirements rather than attribution engineering.

## X. Alternative Measures Commonly Used in Industry

28. Based on my experience, Epic Games could have implemented alternative measures to materially improve attribution of electronic acceptance, including requiring re-authentication at acceptance, binding acceptance to verified adult profiles, maintaining detailed acceptance audit logs, or implementing separate acceptance flows for parents and minors.

29. These measures are commonly used in consumer platforms, including gaming and subscription services, where shared devices and minor users are anticipated.

## XI. Opinion

30. Based on my application of the methodology described above, my review of the Saunders Declaration, and my professional experience, it is my opinion that Epic Games has not demonstrated the existence of reliable, industry-standard processes for attributing electronic acceptance of its End User License Agreement to a specific individual.

31. Although Epic Games produced detailed system logs and timestamps, the absence of person-level attribution controls, the lack of documented verification processes, and the

7

account-level framing of user activity prevent reliable attribution of acceptance to any particular person.

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____March 6_____, **2026**, at _____Riverside County_____.

Kenneth J. Moyle, Jr.