**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUSAN FRENCH, as Legal Guardian/ Parent and Natural Guardian of Z.F., a minor,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| **v.** | : | |
| | : | **NO. 25-5306** |
| **ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, MOJANG AB., and JOHN DOES 1-50,** | : | |
| Defendants. | : | |

**Perez, J.** **July 29, 2026**

**MEMORANDUM**

This is one of many cases across the country arising from children's use of and resulting addiction to video games, including Fortnite, a video game produced by Defendant Epic Games, Inc. ("Epic"), Roblox, an online platform operated by Defendant Roblox Corporation ("Roblox"), and Minecraft, a video game developed by Defendant Mojang AB ("Mojang"), which is a wholly owned subsidiary of Defendant Microsoft Corporation ("Microsoft"). All games can be played on Microsoft's Xbox platform. Before playing Fortnite, Roblox, or Minecraft, or using the Xbox platform, users must create accounts, log in to those accounts, and accept user agreements containing binding arbitration clauses. Defendants invoke those user agreements in moving to compel Z.F. to arbitrate the claims against them. For the reasons discussed herein, Defendants' motions to compel arbitration are granted.

## I. Background

Z.F. began playing video games at approximately three years old. ECF No. 1 ¶¶ 14, 280. Now a teenager, Z.F. allegedly suffers from video game addiction, a condition they contend was

caused by Defendants' unreasonably dangerous products. *Id.* ¶¶ 14, 281. On September 16, 2025, Susan French, Z.F.'s mother, filed the Complaint on Z.F.'s behalf as Z.F.'s parent and natural guardian. ECF No. 1 ¶ 12. The Complaint asserts 16 causes of action, including strict product liability, negligence, and fraud. ECF No. 1. French raises no claims on her own behalf. *Id.* ¶ 12. On October 7, 2025, Plaintiff and Epic entered a joint stipulation extending Epic's deadlines to move, answer, or otherwise respond to the Complaint, setting a deadline of January 9, 2026 for Epic's motion to compel arbitration. ECF No. 7. On October 15, 2025, Plaintiff, Roblox, and Microsoft filed an additional stipulation setting the same deadlines for Roblox's and Microsoft's motions to compel arbitration. ECF No. 17. Defendants each timely filed motions to compel arbitration, and those motions have been fully briefed and are ripe for review.

**A. Z.F.'s Epic Accounts**

Before playing Fortnite, a player must create an Epic account. Saunders Decl., ECF No. 47-2 ¶¶ 32–33. They must then log into their account and accept the Fortnite End User License Agreement ("EULA"), which is displayed on the screen. *Id.* ¶¶ 32–34. Players can scroll through the EULA and click "accept" or "decline." *Id.* ¶ 34. However, they cannot continue to play Fortnite without accepting the EULA's terms. *Id.* ¶¶ 33–34. The EULA contains an arbitration clause requiring the parties to submit all disputes to arbitration, including those related to "the validity, enforceability, or scope of this Binding Individual Arbitration section." EULA §§ 12.3–12.3.1; ECF No. 47-2 ¶¶ 37–38.

Epic located three accounts belonging to minor Plaintiff Z.F., each of which was created on an Xbox console. ECF No. 52-1 ¶ 47. The first was created on September 30, 2017 ("Epic Account #1"). ECF No. 52-1 ¶ 47.a. It is linked to Z.F.'s parent's email address and reflects a birthdate corresponding to Z.F.'s age. *Id.* The second was created on December 24, 2017 ("Epic

Account #2”). *Id.* ¶ 47.b. It is linked to a different name and email address and reflects that the creator entered a birthdate that would currently make them 18 years old or older. *Id.* The third was created on May 7, 2020 (“Epic Account #3”). *Id.* ¶ 47.c. It is linked to a name and email address of the same parent as Epic Account #1 and reflects that the creator entered a birthdate that would currently make them 18 years old or older. *Id.* The accounts have been most frequently accessed from the same physical location. *Id.* ¶ 49. Epic’s records also show that Account #1 accepted the EULA five times—once upon its creation and again when its terms were updated in 2019, 2023, and 2025. *Id.* ¶¶ 50–60. Epic Accounts #2 and #3 each accepted the EULA four times. *Id.* ¶¶ 61–79. Epic Account #2 has been used many times since Plaintiff initiated this lawsuit, and its user accepted an updated EULA as recently as October 17, 2025, one month after the Complaint was filed and ten days after the parties filed a stipulation indicating Epic would move to compel arbitration. *Id.* ¶¶ 68–70; *see also* ECF No. 7. Plaintiff does not dispute that these accounts belong to Z.F.

**B. Z.F.’s Roblox Account**

To use the Roblox platform, users must create a Roblox account and agree to Roblox’s Terms of Use (“RTOU”). Jit Decl., ECF No. 51-2 ¶ 10. The RTOU contains an arbitration clause, which applies to “any dispute, claim, or controversy [the user] ha[s] with Roblox arising under or relating in any way” to Roblox’s terms or services. 2023 RTOU § 11, ECF No. 51-5 at 20.[1] For minors, their “Responsible Adult” must agree on their behalf. *Id.* at 3 (“If you are under the legal age of majority (a ‘minor’) . . . before using the services, your parent or legal guardian must read

[1] This version of the RTOU came into effect on August 1, 2023. ECF No. 51-4 at 2. The previous version read: “If there is a Dispute about something covered by the Roblox Terms, it will be handled based on the version of the Roblox Terms that applied when the Dispute happened. ‘Dispute’ means any dispute, action, or claim relating to any part of the Roblox Terms, including those that come up after the Roblox Terms or User’s Account terminates.” 2022 RTOU § 16, ECF No. 51-4 at 15. The later versions of the RTOU contain the same language as that contained in the 2023 RTOU. 2024 RTOU § 11, ECF No. 51-6 at 21; 2025 RTOU § 11, ECF No. 51-7 at 15.

and consent to the Roblox terms." (capitalization removed)). The RTOU further provides that "[t]he arbitrator . . . shall have exclusive authority to the extent permitted by law to resolve all Disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of the [RTOU], including, but not limited to, any claim that all or any part of the [RTOU] is void or voidable." *Id.* at 26.

Roblox account users receive periodic updates to the RTOU through pop-up notices, which include a hyperlink to the updated terms. ECF No. 51-2 ¶ 14. The pop-up notices require users to click "I Agree" before continuing to use the platform. *Id.* The notice states: "If you are a minor, please show this to your parent or guardian." *Id.* The notice also appears in players' "Messages." *Id.* ¶ 11. The message directs minor players to share the updated terms with their parent/guardian. *Id.* ¶ 13. They must either agree to the updated RTOU or close their Roblox account. *Id.* ¶ 13. Users also must agree to the RTOU when purchasing Robux, virtual in-game currency that can be used to acquire virtual items and access virtual experiences. *Id.* ¶¶ 5, 19. The purchase screen includes the following disclosure: "By purchasing Robux, you agree to our **Terms of Use** and **Privacy Policy**, including the arbitration clause." *Id.* ¶ 19.

Roblox identified Z.F.'s Roblox Account, which was created on May 13, 2021. *Id.* ¶ 6. Pop-up notices were sent to the Roblox Account in August 2023, February 2024, June 2024, November 2024, and June 2025. *Id.* ¶ 14. Following each notice, the Roblox Account continued to be used. *Id.* ¶ 15. The Roblox Account remains open and was most recently used on December 30, 2025. *Id.* In addition, two Robux purchases were made on the Account—on April 8, 2024, and August 1, 2025. Jit Decl. Ex. 1, ECF No. 51-3. Z.F. alleges in the Complaint that "Z.F. has purchased Roblox currency, Robux, to utilize on the Roblox platform." ECF No. 1 ¶ 282. Plaintiff does not dispute this account belongs to Z.F.

### C. Z.F.'s Microsoft and Xbox Accounts

To use Xbox services, a user must have both a Microsoft account and an associated Xbox account. Abbott Decl., ECF No. 53-2 ¶¶ 3–4. When creating a Microsoft account, users are shown a screen indicating that "Choosing **Next** means that you agree to the Microsoft Services Agreement" ("MSA"). Scari Decl., ECF No. 53-1 ¶ 3. Users may click on the hyperlinked words "Microsoft Services Agreement" to review a copy of the MSA. *Id.* ¶ 4. Users with an existing Xbox account on August 1, 2015 were also required to affirmatively accept the MSA while logged into their Xbox account.[2] ECF No. 53-2 ¶ 5. They were shown a screen with a link to the MSA and a button that said, "I accept." *Id.* Users could not continue to access or use their Xbox account if they did not click "I accept." *Id.*

The MSA contains an arbitration clause, which applies to disputes concerning Microsoft's services, including "Minecraft games" and various Xbox services. MSA § 15, ECF No. 50-7 at 26–27. The MSA states: "By creating a Microsoft account or using the Services, you accept and agree to be bound by these Terms and represent that you have either reached the age of 'majority,' . . . or your parent or legal guardian agrees to be bound by these Terms on your behalf." *Id.* § 4(a)(iii), ECF No. 50-7 at 5. It further provides: "If you are the parent or legal guardian of a minor, you and the minor accept and agree to be bound by these Terms . . . whether the minor's account is now open or created later." *Id.* Periodically, Microsoft updates the MSA. When that occurs, it sends an email notice to the user's registered email address requiring them to stop using and close their accounts if they do not agree to the updated terms. ECF No. 53-1 ¶¶ 7–8. Microsoft also notifies account holders of the changes through "interrupt" notices, which pop up on the user's

[2] Before that date, Xbox accounts were governed by a different agreement. ECF No. 53-2 ¶ 5.

screen. *Id.* ¶ 9; ECF No. 50-20. When faced with the interrupt notices, users may click on a link to learn more or click "Next." *Id.*

Plaintiff provided information to counsel for Microsoft and Mojang identifying Z.F.'s name and date of birth, username/gamertags used in connection with Microsoft and Mojang's games and services, the email address associated with those accounts, and the account billing address. Tulante Decl., ECF No. 53-3 ¶ 3. Based on that information, Microsoft identified a Microsoft Account, which was created on March 26, 2013. ECF No. 53-1 ¶ 10. The Microsoft Account remains open and most recently clicked on an interrupt notice to accept updates to the MSA on October 26, 2025. *Id.* Microsoft also identified Z.F.'s Xbox Account, which was created on March 12, 2015. ECF No. 53-2 ¶ 7. The Xbox Account remains open and was most recently used on January 2, 2025 on an Xbox console and a Windows 10 PC. *Id.* The Xbox Account also has a Visa credit card in Z.F.'s name, which was used to make a purchase as recently as December 30, 2025. *Id.* Plaintiff does not dispute these accounts belong to Z.F. Indeed, when Plaintiff's counsel provided the information necessary to identify the accounts, they indicated the accounts belong to Z.F. Br. Pl.'s Ex. C, ECF No. 66 at 3 (listing "Minor Plaintiff's Account Identifying Information").[3]

## II. Discussion

### A. Governing Legal Principles

The FAA, 9 U.S.C. § 1 et seq., "expresse[s] a strong federal policy in favor of resolving disputes through arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584

[3] Plaintiff argues Z.F. admitted only to accessing the accounts identified by the information they emailed to Microsoft, not that they admitted to creating the accounts. *Id.* They attach the letter they sent to Microsoft's counsel, which states: "This letter is in response to your request for any account identifying information that Plaintiff alleges accessing in connection with Defendants Microsoft Corporation's ("Microsoft") and Mojang AB's ("Mojang") games and services. . . . [B]elow please find the requested information for minor Plaintiff Z.F.: I. Minor Plaintiff's Name . . . . II. Minor Plaintiff's Account Identifying Information: Usernames/gamertags, etc. . . . . Account email addresses . . . . III. Account Billing Address . . . ." ECF No. 66 at 3.

F.3d 513, 522 (3d Cir. 2009). However, arbitration is a creature of contract, and "[a] court can compel a party to arbitrate only if the party agreed to arbitration." *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 142 (3d Cir. 2022). The Court, therefore, "consider[s] two 'gateway' questions: (1) whether the parties have a valid arbitration agreement at all (i.e., its enforceability), and (2) whether a concededly binding arbitration clause applies to a certain type of controversy (i.e., its scope)." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (citation modified).

Where, as here, the arbitration agreement is not apparent on the face of the complaint, courts apply the summary judgment standard to determine whether, viewing the evidence in the light most favorable to the party opposing arbitration, there is a genuine factual dispute as to the existence, enforceability, or scope of the arbitration agreement. *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 381 n.7, 319–20 (3d Cir. 2024); *see also* Fed. R. Civ. P. 56. Once the moving party produces sufficient evidence to show the absence of a genuine dispute as to formation, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In analyzing whether a valid arbitration agreement was formed, courts look to ordinary state-law principles governing contract formation. *Century Indem. Co.*, 584 F.3d at 524. Under Pennsylvania law, the Court considers: "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998). Manifestation of an intent to be bound is generally shown through

offer and acceptance. *Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer Sys. Inc.*, 671 A.2d 1140, 1146 (Pa. Super. Ct. 1996).[4]

Pennsylvania courts generally enforce electronic agreements,[5] *Pricharda v. Checkr, Inc.*, No. 22-cv-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (collecting cases), and the Uniform Electronic Transactions Act, 73 P.S. § 2260.310(2), "validates . . . anonymous click-through transaction[s]," *id.* at cmt. 2. Electronic agreements may be proven with records showing the offeree identified himself with personal information like a Social Security number or unique username and password. *See Schrock v. Nomac Drilling, LLC*, No. 15-cv-1692, 2016 WL 1181484, at *4 (W.D. Pa. Mar. 28, 2016) (finding use of last four digits of Social Security number sufficient

[4] Epic relies on North Carolina law, pursuant to the EULA's choice-of-law provision, EULA § 11, and Kentucky law, Z.F.'s residence at the time of formation. ECF No. 52 at 10 n.3. Microsoft relies on Kentucky law but notes that it is consistent with Pennsylvania law. *See* ECF No. 53 at 17. Roblox relies on Pennsylvania law. ECF No. 51-1 at 8. Plaintiff relies on Pennsylvania and Kentucky law. ECF No. 65 at 10 n.2; *see also* ECF No. 62 at 10; ECF No. 64 at 10.

In evaluating an arbitration agreement, federal courts look to the forum state's choice of law principles. *See Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007). Under Pennsylvania law, the first inquiry is "whether the laws of the two jurisdictions would produce the same result on the particular issue presented." *White v. Sunoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017) (cleaned up). "If the results would be the same, there is no actual conflict and [the Court] should avoid the choice-of-law question." *Id.* (cleaned up).

There is no conflict between Pennsylvania, North Carolina, and Kentucky law, so the Court need not resolve the choice-of-law question. For questions of contract formation, all require a showing of mutual assent, which is generally evidenced through offer and acceptance. *Creech v. Melnik*, 495 S.E.2d 907, 912 (N.C. 1998); *Refuse Mgmt. Sys., Inc.*, 671 A.2d at 1146; *Univ. of Ky. v. Regard*, 670 S.W. 3d 903, 912 (Ky. 2023) ("The essential elements of a valid contract are an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration."). Additionally, each state provides that a contract with a minor is voidable, not void. *See Santiago v. Philly Trampoline Park, LLC*, 291 A.3d 1213, 1224 (Pa. Super. 2023) ("A contract executed by a minor is not void *ab initio*, but is voidable such that the minor may, upon reaching majority, avoid any contract other than for necessaries."); *Chandler v. Jones*, 90 S.E. 580, 581 (N.C. 1916) ("contract of an infant is voidable and not void"); *Mitchell ex rel. Fee v. Mitchell*, 963 S.W.2d 222, 223 (Ky. Ct. App. 1998) ("[A] contract executed by a minor is enforceable by the minor but may be avoided by the minor if not affirmed by him after reaching adulthood."). Accordingly, the Court will avoid the choice-of-law question and apply Pennsylvania law. The Court also cites to Kentucky law where the parties raise arguments specific to Kentucky law.

[5] Plaintiff does not argue the electronic agreements are unenforceable as clickwrap agreements due to ambiguity or inconspicuous terms. *See Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 WL 4476646, at *7 (E.D. Pa. Oct. 11, 2024) (explaining clickwrap agreements are enforceable where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms" (citation modified)).

to "indicate[ ] that it was Plaintiff, and not some other person – whom Plaintiff has not even attempted to identify – who electronically signed the form"); *see also Tomlin v. Roblox Corp.*, No. 25-4301, 2026 WL 1412606, at *6 (E.D. Pa. May 20, 2026).

A non-signatory may be bound to a contract under several theories, including third-party beneficiary, equitable estoppel, and agency/principal. *E.I. DuPont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001). Third-party beneficiaries are bound by arbitration provisions contained in contracts where their "claims arise out of the underlying contract." *Doeff v. Transatl. Reins. Co.*, No. 07-2110, 2007 WL 4373041, at *2 (E.D. Pa. Dec. 13, 2007) (citing *E.I. Dupont De Nemours*, 269 F.3d at 195). Equitable estoppel, meanwhile, prevents nonsignatories to a contract from disavowing the arbitration provision while simultaneously receiving a direct benefit from the contract. *See E.I. Dupont De Nemours*, 269 F.3d at 199–200; *Olshan Foundation Repair & Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. 2009). Finally, under traditional agency principles, when a principal manifests to a third party that an agent is authorized to enter transactions on his behalf, and the third party reasonably relies on that manifestation, the principal is bound to the contract. *Washburn v. N. Health Facilities, Inc.*, 121 A.3d 1008, 1015 (Pa. Super. Ct. 2015) ("[A]pparent authority exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted agent authority he or she purports to exercise."); *see also Mark D. Dean, P.S.C. v. Commonwealth Bank & Trust Co.*, 434 S.W.3d 489, 500 (Ky. 2014); Restatement (Third) of Agency § 2.03 (2006). In discussing the agency theory, however, the Supreme Court of Pennsylvania has ruled that "parents are without authority to bind a minor child to an agreement to arbitrate." *Santiago v. Philly Trampoline Park, LLC*, 343 A.3d 995, 1015 (Pa. 2025). Nevertheless, in a similar case, this Court has already held that *Santiago* treats arbitration agreements differently than other contracts, and it

is, therefore, preempted by the FAA. *Tomlin*, 2026 WL 1412606, at *15. Accordingly, even in Pennsylvania, a minor may be bound by an agreement to arbitrate contained within a contract to which they are a non-signatory under traditional contract principles. *Id.*

Finally, Pennsylvania law also provides certain protections to minors entering into contracts, allowing them to disaffirm a contract to avoid its enforcement. *Aetna Cas. & Sur. Co. v. Duncan*, 972 F.2d 523, 526 (3d Cir. 1992); *see also* Restatement (Second) of Contracts § 7. However, a contract with a minor is voidable by the minor; that does not make it void from the outset. *Santiago v. Philly Trampoline Park, LLC*, 291 A.3d 1213, 1224 (Pa. Super. Ct. 2023), *aff'd* 343 A.3d 995 (Pa. 2025). Furthermore, the minor cannot continue receiving benefits from a contract while disaffirming only the parts they find unfavorable. *See* Restatement (Second) of Contracts § 380 ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract."); 3 Williston on Contracts § 7:14 (4th ed.) ("A minor may be estopped to cancel, rescind or terminate its own contract if, for example, the minor wants to affirm those provisions of [the] agreement that are favorable to it and repudiate those portions of the contract that are burdensome or unfavorable. A minor may not retain the benefits of a contract and, at the same time, try to repudiate its obligations under the agreement."); *Morrow v. Norwegian Cruise Line Ltd.*, 262 F. Supp. 2d 474, 476 (M.D. Pa. 2002); *Mueller v. Ragsdale*, 165 S.W. 404, 405 (Ky. 1914) ("One may not at maturity disaffirm that part of a contract which has become distasteful, or was hurtful to him, and ratify the residue, making it binding on the other party for such purposes as may be of benefit to him."). However, the Court cannot decide questions of an arbitration clause's enforceability, including disaffirmance or unconscionability, if those issues have been clearly and unambiguously delegated to the arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *Zirpoli*, 48 F.4th at 138.

**B. Z.F. and French Agreed to the EULA.**

Here, the undisputed evidence before the Court shows that Epic offered Z.F. the opportunity to play Fortnite in exchange for Z.F.'s agreement to the EULA. Z.F. accepted and played Fortnite, which Z.F. could not have done without accepting the EULA's terms. Z.F. played Fortnite by creating and logging into three Epic accounts, each of which was established with an email address, first and last name, a unique display name, and a password which was unique to Z.F.'s accounts. When the EULA was updated, Z.F. again accepted those terms when logged into the Epic Accounts with Z.F.'s unique display name and password.

Plaintiff does not actually dispute any of those facts. Rather, Plaintiff contends Epic has not sufficiently proven who sat on the other side of the video game screen when clicking "Accept." That does not create a genuine dispute. *See Tomlin*, 2026 WL 1412606, at *7; *see also Antonetti v. Activision Blizzard, Inc.*, 764 F. Supp. 3d 1309, 1319–20 (N.D. Ga. 2025); *Garcia v. Roblox Corp.*, No. 25-cv-03476, 2026 WL 413636, at *3 n.3 (C.D. Cal. Feb. 11, 2026) (rejecting the same argument as "wholly unpersuasive" and "intellectually dishonest"). Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586. Plaintiff has not done so—Plaintiff does not dispute the Epic accounts belong to Z.F. or that Z.F. played Fortnite. Moreover, Plaintiff provides no evidence that would suggest anyone other than Z.F. had access to those accounts. Instead, Z.F. asks this Court to speculate that when the EULA appeared on screen on no less than thirteen occasions, ECF No. 47-2 at 16–18, someone else may have been logged in to Z.F.'s Epic Accounts. Plaintiff has provided no evidence, however, to allow the Court to draw that inference. *See Tomlin*, 2026 WL 1412606, at *6–7; *Schrock*, 2016 WL 1181484, at *4 ("Plaintiff's naked assertions that he never [signed the

forms] are insufficient to lead the Court to conclude otherwise."). Accordingly, Z.F. manifested an intent to be bound by the EULA, and a binding contract was formed.

Even assuming, arguendo, Z.F. did not personally click the "accept" button when setting up the Epic Accounts, two of which were established with French's email address, Z.F. would be bound by the agreement French entered on Z.F.'s behalf. French could not create Epic Accounts without agreeing to the EULA. Plaintiff does not dispute that the Epic Accounts were created for Z.F.'s benefit and that Z.F. was a third-party beneficiary to the agreement between French and Epic. Indeed, the Epic Accounts created with French's information were both identified by Plaintiff as those used by Z.F. Accordingly, there is no genuine dispute that French and/or Z.F. agreed to the EULA for Z.F.'s use of the Epic Accounts. The Court addresses Plaintiff's argument that Z.F. cannot be bound by their parents' agreement to arbitrate below.

### C. Z.F.'s Responsible Adult Agreed to the RTOU.

Roblox presents three theories for how an arbitration agreement was formed: Z.F.'s Responsible Adult agreed to the RTOU when the account was created, Z.F.'s Responsible Adult agreed to the RTOU each time it was updated, ECF No. 51-1 at 3–4; ECF No. 51-2 ¶ 14 (pop-up notices of RTOU updates were sent in August 2023, February 2024, June 2024, November 2024, and June 2025), and Z.F.'s Responsible Adult made two Robux purchases on the Roblox Account, through which she was required to agree to the RTOU, ECF No. 51-1 at 4–5; *see also* Compl. ¶ 340, ECF No. 1 (alleging that "French would not have purchased or allowed Z.F. to use or continue to use" Defendants' products if she had known about the alleged harms); *cf* ECF No. 1 ¶ 282 (alleging "Z.F. has purchased Roblox currency, Robux, to utilize on the Roblox platform").

Z.F.'s "Responsible Adult" entered a binding arbitration agreement with Roblox for Z.F.'s benefit. The undisputed evidence before the Court shows that Roblox offered Z.F. the opportunity

to play Roblox in exchange for Z.F.'s Responsible Adult's agreement to the RTOU. Z.F. played Roblox through use of the Roblox Account, which Z.F. could not have done without Z.F.'s Responsible Adult's acceptance of the RTOU. Each time the RTOU was updated, Z.F.'s Responsible Adult had to accept the updated terms and did so on multiple occasions. The Roblox Account remains open and was used as recently as December 30, 2025—just ten days after Roblox filed its motion to compel arbitration and seventy-six days after the parties stipulated to a deadline for Roblox to file a motion to compel arbitration.

Plaintiff does not affirmatively dispute that Z.F.'s Responsible Adult agreed to the RTOU or that Z.F. is a third-party beneficiary to the RTOU. Plaintiff again argues Roblox has not sufficiently proven who clicked "I agree." As noted above, this argument is unpersuasive.

### D. The RTOU and EULA Delegate Issues of Disaffirmance and Unconscionability to the Arbitrator.

To the extent Plaintiff raises arguments regarding disaffirmance or unconscionability, the EULA and RTOU expressly delegate those issues to the arbitrator, and the Court lacks the authority to decide them. "[P]arties to a contract may delegate questions of arbitrability to an arbitrator. If parties clearly and unmistakably make this choice, then district courts generally must send threshold questions of arbitrability to arbitration to comply with the parties' agreement." *Zirpoli*, 48 F.4th at 138 (emphasis removed). So long as the party opposing arbitration does not specifically challenge the enforceability of the delegation clause itself—as opposed to the contract or arbitration provision as a whole—the Court "possesses no power to decide the arbitrability issue." *Scott v. CVS*, No. 22-3314, 2023 WL 3477827, at *1 (3d Cir. May 15, 2023) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019)).

The delegation clauses of the EULA and RTOU clearly and unmistakably require the parties to submit all disputes to arbitration, including questions related to the validity,

enforceability, or scope of the arbitration clause. EULA § 12.3.1, ECF No. 47-13 at 12 ("'Dispute' means any dispute, claim, or controversy . . . between You and Epic that relates to your use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section."); RTOU § 11.2.7, ECF No. 51-6 at 26 ("The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all Disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of the Roblox Terms, including, but not limited to, any claim that all or any part of the Roblox Terms is void or voidable . . . ."). Plaintiff argues their challenges to the whole of the EULA and RTOU are necessarily challenges to the delegation provisions themselves. Not so. Such a challenge does not allow the Court to consider issues clearly delegated to the arbitrator. *See Rent-A-Center,* 561 U.S. at 72. The Court, therefore, cannot decide the questions of disaffirmance or unconscionability raised in Plaintiff's oppositions to Epic's and Roblox's motions.

**E. Z.F. and French Agreed to the MSA**[6]

Microsoft and Mojang argue Z.F. is bound by the MSA's arbitration clause based on Z.F.'s creation of an Xbox account and use of the Xbox services and Minecraft for years, based on Z.F.'s parent's creation of a Microsoft Account and Z.F.'s third-party beneficiary status, and under a theory of equitable estoppel.

Z.F.'s parent, French, agreed to the MSA when creating her Microsoft account in March 2013. In creating her Microsoft Account, she was required to click "Next" below the statement: "Choosing Next means that you agree to the [MSA]," which provided a link to the MSA. ECF No.

[6] The parties do not raise any arguments that separate Mojang's right to enforce the MSA's arbitration clause against Plaintiffs from Microsoft's right to enforce the MSA's arbitration clause. Accordingly, like the parties, the Court treats Microsoft's and Mojang's rights and arguments as one.

¶¶ 3–4. Following her account creation, the MSA was updated to contain a provision stating "[i]f you are the parent or legal guardian of a minor, . . . you and the minor accept and agree to be bound by these Terms and are responsible for all use of the Microsoft account or Services, including purchases, whether the minor's account is now open or created later." MSA § 4(a)(iii), ECF No. 50-16 at 2; *see also, e.g.*, ECF No. 50-11 at 4. At the time of her account creation and in the following update, the MSA stated that "using or accessing the Services" constitutes acceptance of the MSA. ECF No. 50-16 at 2; ECF No. 50-17 at 2. Accordingly, Z.F.'s later Xbox Account creation, use of the Xbox, and Minecraft constituted French's acceptance of the MSA on Z.F.'s behalf.

Additionally, Z.F.'s Xbox account was created on March 12, 2015. ECF No. 53-1 ¶ 7. Just a few months later, Z.F. was required to affirmatively accept the 2015 MSA to continue using the Xbox. ECF No. 53-2 ¶ 5. Z.F. continued using the Xbox following this and additional subsequent updates, up to and including January 2, 2026. ECF No. 53-2 ¶ 7. Each time the MSA was updated, the Xbox user who was logged into Z.F.'s Xbox Account must have acknowledged each update. ECF No. 53-1 ¶¶ 9–10. A credit card in Z.F.'s name was used to make purchases on the Xbox Account as recently as December 30, 2025, three months after the Complaint was filed. ECF No. 53-2 ¶ 7. Z.F., therefore, independently agreed to the MSA's terms.

This evidence sufficiently establishes that contracts were formed between Z.F. and Microsoft and between French and Microsoft. Microsoft and Mojang offered Z.F. the opportunity to use the Xbox platform and to play Minecraft in exchange for Z.F.'s agreement to the MSA, including its arbitration clause. Z.F. and French accepted the MSA by creating the Microsoft Account and Xbox Account and by continuing to use those accounts following notices of updated terms. In consideration of the agreement, Z.F. was able to continue playing Minecraft and using

the Xbox console. *See ATACS Corp.*, 155 F.3d at 666 (explaining a contract requires manifestation of intent to be bound, sufficiently definite terms, and consideration); *Refuse Mgmt. Sys.*, 671 A.2d at 1146 (explaining manifestation of intent to be bound is generally shown through offer and acceptance); *Univ. of Ky.*, 670 S.W. 3d at 912. Plaintiff provides no evidence to the contrary. Indeed, Plaintiff's counsel identified the usernames/gamertags associated with Z.F.'s Xbox Account. ECF No. 66 at 3. Plaintiff puts forth no evidence showing anyone else had access to or used Z.F.'s Xbox Account. Mere speculation that it could have been someone else sitting on the other side of the screen acknowledging the MSA and its updates does not create a genuine dispute of material fact. *Tomlin*, 2026 WL 1412606, at *10. Accordingly, contracts were formed between Z.F. and Microsoft and French and Microsoft for Z.F.'s benefit.

The Court must still determine whether Z.F. disaffirmed the MSA because, unlike the EULA and the RTOU, the MSA does not delegate issues of enforceability to the arbitrator. The Court finds that Z.F. has not disaffirmed the MSA under either Pennsylvania or Kentucky law. Plaintiff relies on the filing of this lawsuit as evidence of Z.F.'s disaffirmance. However, Z.F. continues to reap the benefits of the MSA by playing Xbox and Minecraft. Indeed, Z.F. played Minecraft as recently as December 2, 2025. ECF No. 53-2 ¶ 7. The Xbox Account was last accessed on January 2, 2026. *Id.* Z.F. "cannot ratify the parts of the contract that are favorable to them and disaffirm the parts that are not." *Tomlin*, 2026 WL 1412606, at *11 (applying Pennsylvania law); *Mueller*, 165 S.W. at 405 (applying Kentucky law); *see also Duncan*, 972 F.2d at 526 (explaining that disaffirmance "is not to be employed as a vehicle whereby the minor is enabled to practice unconscionable business methods. It is a shield for defense, not a sword for offense" (citation modified)).

Plaintiff relies on cases explaining a minor is not required to return the benefit received if it cannot be returned. These cases are inapposite. It is true that Z.F. could not return the past benefits: Z.F. cannot give back the hours Z.F. played Minecraft or other games on an Xbox. However, Z.F. continues to receive new, additional benefits each time Z.F. uses the Microsoft services. Microsoft correctly and persuasively argues that "the law does not allow Z.F. to continue reaping [new] benefits of the MSA while cherry-picking which provisions they would not like to apply." ECF No. 70 at 11 (citing *Courtright v. Epic Games, Inc.*, 766 F. Supp. 3d 873, 897 (W.D. Mo. 2025); *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 900 (S.D. Ill. 2012); *G.G. v. Valve Corp.*, 2017 WL 1210220, at *3 (W.D. Wash. Apr. 3, 2017), *aff'd in relevant part*, *vacated on other grounds*, 799 F. App'x 557 (9th Cir. 2020); *C.M.D. v. Facebook, Inc.*, 2014 WL 1266291, at *4 (N.D. Cal. Mar. 26, 2014), *aff'd*, 621 F. App'x 488 (9th Cir. 2015)). Accordingly, Z.F. has not properly disaffirmed the MSA and is bound by the arbitration clause contained therein.[7]

**A. Z.F. May Be Bound by the Arbitration Provisions as a Non-Signatory**

Plaintiff also argues that as a minor, Z.F. cannot be bound as a non-signatory to their parents' agreement to arbitrate. *E.g.*, ECF No. 62 at 7. For the reasons set forth in Section IV.E. of this Court's Memorandum in *Tomlin*, 2026 WL 1412606, at *13–15, Z.F. may be bound as a third-

[7] To the extent Plaintiff argues the MSA is unconscionable, that argument was not fully developed. Plaintiff argues they could not fully develop the argument because Microsoft presented only portions of the MSA. That argument lacks merit. Microsoft provided the full text of each MSA in effect throughout the relevant time period. Plaintiff's failure to develop an unconscionability argument is a waiver of the argument. *Markert v. PNC Fin. Servs. Grp.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("Throw-away arguments left undeveloped are . . . considered waived."). Plaintiff's request for discovery into the unconscionability of the MSA must also be denied because Plaintiff does not identify what facts may be discoverable that would place the agreement to arbitrate in issue. *Williams v. Red Stone, Inc.*, No. 18-cv-2747, 2019 WL 9104166, at *3 (E.D. Pa. Mar. 25, 2019).

party beneficiary to the agreements between Z.F.'s parent and Defendants under Pennsylvania law.[8]

The result would be the same under Kentucky law. The case law Plaintiff cites would not invalidate an arbitration agreement to which Z.F.'s parent agreed on Z.F.'s behalf or the agreement Z.F. entered for him/herself. Plaintiff relies on *Miller ex rel. E.M. v. House of Boom Ky., LLC*, which determined a parent could not bind a child to a pre-injury liability waiver. 575 S.W.3d 656, 657 (Ky. 2019). The waiver would have completely "terminat[ed] the child's potential right to compensation for an injury occurring" at the defendant's facility. *Id.* at 658. The court explained that pre-injury release waivers are generally disfavored and found this waiver violated public policy because it negated any opportunity for the child to bring a tort claim—the child's property right. *Id.* at 660. Notably, the public policy at issue in *Miller* was the complete opposite of the public policy favoring arbitration agreements. Indeed, rather than recognizing arbitration agreements as a waiver of a substantive property right, the Supreme Court has characterized such agreements as "specialized forum-selection clause[s]," which do "not alter or abridge substantive rights." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022) (citation modified). Instead, arbitration agreements "merely change[] how those rights will be processed." *Santiago*, 343 A.3d at 1015–16 (Brobson, J., dissenting in relevant part) (internal quotation marks omitted) (quoting *Viking River Cruises, Inc.*, 596 U.S. at 653).

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' motions to compel arbitration. This matter must be stayed pending the outcome of the arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478

[8] Plaintiff does not argue Z.F. was not a third-party beneficiary to the agreements at issue. Plaintiff instead argues that Z.F.'s parents cannot bind Z.F. to arbitration. Accordingly, the Court does not address the elements of whether Z.F. is a third-party beneficiary to the contracts entered by Z.F.'s parent.

(2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

An appropriate Order follows.